**UNITED STATES, Appellee,**

v.

**Michael R. OLMSTEAD, Midshipman First Class, U.S. Navy, Appellant.**

**No. 45323.**
**NMCM 81–3007.**

United States Court of Military Appeals.

March 12, 1984.

For Appellant: *Lieutenant Mark A. Zuboff, JAGC, USNR* (argued); *Lieutenant*

*Commander David S. Durbin, JAGC, USNR* (on brief); *Lieutenant Commander Richard K. Delmar,* JAGC, USNR.

For Appellee: *Lieutenant Commander D.L. Kelly, JAGC, USN* (argued); *Commander W.J. Hughes, JAGC, USN,* and *Lieutenant Commander William A. Dorsey, JAGC, USNR* (on brief).

*Opinion of the Court*

COOK, Judge.

Appellant was convicted, contrary to his pleas, of involuntary manslaughter in violation of Article 119, Uniform Code of Military Justice, 10 U.S.C. § 919. He was sentenced to dismissal from the Naval service. The convening authority approved the findings and sentence, but suspended, and ultimately remitted, the sentence. The Court of Military Review affirmed, and we granted review of the following issue:

> DID THE MILITARY JUDGE ERR IN FAILING TO SUPPRESS EVIDENCE RELATING TO THE VEHICLE INVOLVED IN THE CHARGE AND SPECIFICATION?

Appellant was a Midshipman at the United States Naval Academy, Annapolis, Maryland. In the early morning hours of Sunday, May 11, 1980, he was involved in a single car automobile accident on the Academy grounds. The vehicle—a two-seater Porsche registered in the name of appellant's father—failed to negotiate a turn, crashed into a large tree at the right-hand side of the road, flipped over, and skidded to a halt off the left side of the road. Appellant was partially trapped under the vehicle. Though he sustained substantial injuries, he recovered. The other occupant of the vehicle, Midshipman Scott Thomas, was less fortunate. He was found on the ground some ten to fifteen feet in front of the vehicle. Though he was able to respond initially to his rescuers, he died several hours later at a hospital. His death gave rise to the charge against appellant.

The physical evidence established that the vehicle was travelling substantially in excess of the posted speed limit, and there is no doubt that appellant was intoxicated at the time. The only real issue on the merits was who was driving the car. The evidence pointing to appellant as the driver came from three principal sources: First, three other midshipmen testified, with varying degrees of certainty, that they saw Thomas in the passenger seat of the vehicle as it pulled away from the off-base establishment where the group of midshipmen had been drinking and socializing. This observation was contrary to their expectation, because they thought they had prevailed upon appellant to relinquish the wheel to Thomas, in view of appellant's advanced state of intoxication. Second, human hair matching samples taken from the deceased was removed by investigators from the upper windshield molding adjacent to the passenger's seat. Finally, an accident reconstruction team from the Maryland State Police studied the vehicle, the accident scene, and the injuries to appellant and Thomas. Their conclusion was that appellant was most likely the driver.

The issue on this appeal is whether it was lawful for the Naval law enforcement authorities to seize and examine the vehicle. If not, the accident reconstruction team's findings and the hair found in the car should have been excluded from evidence. Mil.R.Evid. 311(a). The facts pertinent to the seizure and search of the car are as follows:

After the crash and after the ambulance had departed, the Naval Academy police decided to remove the car from the public way. Accordingly, they called a local civilian towing company and had the vehicle towed to a civilian garage. The police were of the view that the car had been seized as evidence, and they told the tow truck driver that "nobody was to touch the vehicle unless they were authorized by the Naval Academy." Apparently no significant examination of the car was attempted at the scene, though several photographs were taken.

Shortly after the car was towed, Special Agent N. Darden Nelms, Naval Investigative Service, was contacted; he quickly arrived at the scene. After briefly viewing the scene and interviewing knowledgeable persons at the Academy, Nelms proceeded directly to the service station to examine the car. He was accompanied by Commander Aimo W. Hill, the Naval Academy Security Officer, who had also been somewhat belatedly notified. Nelms and Hill looked the car over carefully, and Nelms removed pieces of glass and "assorted papers" from the car. He testified that he was looking for any evidence that might be pertinent to his investigation, as well as anything that might be a hazard to public safety. After an hour or so, the two officers made arrangements to have the vehicle towed back to the Academy, where it was stored in a secured garage.

The next day, May 12th, Nelms examined the car more thoroughly at the Academy and had numerous photographs taken. The service adviser from a local Porsche/Audi dealer inspected the exposed transmission. Nelms removed certain parts of the car, including the critical windshield molding with the hair specimens attached.

Approximately three and one-half weeks later, the accident reconstruction team studied the car. More photographs were taken, and more parts and specimens were removed for analysis. It was conceded by the government witnesses that at no time during the investigation of the case was any authorization to search or seize the car or its contents obtained from any magistrate or commander.

Appellant made a timely pretrial motion to suppress any evidence connected with the vehicle after it was initially towed from the Academy grounds. The military judge considered the primary question to be whether the Government transferred "official custody" to the service station, there being no question that "physical custody" was, for a time, transferred. On reviewing the testimony, the judge concluded that "the car was never released to private custody" after its initial seizure. On that basis he

denied the motion. The Court of Military Review agreed with the trial judge's reasoning, adding its own ground that the car was an "instrumentality of a crime which was in plain view of authorities and, as such, appellant had no reasonable expectation of privacy in the car, or its contents." *United States v. Olmstead,* unpublished opinion at 7 (October 18, 1982). Therefore, the Court of Military Review concluded that a warrant was not necessary.

■ The view we take of the case makes it unnecessary to consider theories other than expectation of privacy. The Fourth Amendment guarantee of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" is not unlimited. As the Supreme Court has

> uniformly ... held[,] ... the application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. *E.g., Rakas v. Illinois,* 439 U.S. 128, 143, and n. 12 [99 S.Ct. 421, 430, and n. 12, 58 L.Ed.2d 387] (1978); *id.,* at 150, 151 [99 S.Ct. at 434] (concurring opinion); *id.,* at 164 [99 S.Ct. at 441] (dissenting opinion); *United States v. Chadwick,* 433 U.S. 1, 7 [97 S.Ct. 2476, 2481, 53 L.Ed.2d 538] (1977); *United States v. Miller,* 425 U.S. 435, 442 [96 S.Ct. 1619, 1623, 48 L.Ed.2d 71] (1976); *United States v. Dionisio,* 410 U.S. 1, 14 [93 S.Ct. 764, 771, 35 L.Ed.2d 67] (1973); *Couch v. United States,* 409 U.S. 322, 335–336 [93 S.Ct. 611, 619–620, 34 L.Ed.2d 548] (1973); *United States v. White,* 401 U.S. 745, 752 [91 S.Ct. 1122, 1126, 28 L.Ed.2d 453] (1971) (plurality opinion); *Mancusi v. DeForte,* 392 U.S. 364, 368 [88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154] (1968); *Terry v. Ohio,* 392 U.S. 1, 9 [88 S.Ct. 1868, 1873, 20 L.Ed.2d 889] (1968).

*Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). *See also Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

Moreover, the Supreme Court has held that

> [o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels at public thoroughfares where both its occupants and its contents are in plain view. See *People v. Case,* 220 Mich. 379, 388–389, 190 N.W. 289, 292 (1922). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S., at 351 [88 S.Ct. at 511]; *United States v. Dionisio,* 410 U.S., at 14 [93 S.Ct. at 771].

*Cardwell v. Lewis,* 417 U.S. 583, 590–91, 94 S.Ct. 2464, 2469–2470, 41 L.Ed.2d 325 (1974). Thus, unless society is prepared to recognize appellant's continued interest of privacy in his vehicle, he has no ground for contending that the government officers violated his constitutional rights.

*Michigan v. Clifford,* —— U.S. ——, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984), was an arson case which is instructive to our inquiry. A team of arson investigators arrived at the Clifford's partially burned dwelling some five hours after the fire had been extinguished and after all of the firefighters and police officials had departed. Substantial portions of the house were "largely undamaged by the fire," and a work crew was in the process of boarding-up the premises and pumping water from the basement. The Supreme Court held, under the circumstances, that "the Cliffords retained reasonable privacy interests in their fire-damaged residence and that the post-fire investigations were subject to the warrant requirement" of the Fourth Amendment. *Id.* 104 S.Ct. at 648. However, the Court observed that "[s]ome fires may be so devastating that no reasonable privacy interests remain in the ash and ruins, regardless of the owner's subjective expectations." *Id.* at 646.

■ Thus we come to the question of what expectation of privacy appellant could reasonably have retained in his vehicle. First, we note that the vehicle was utterly demolished and left, albeit unintentionally, upside down on the grounds of the Naval Academy. The car had permanently ceased its function as a means of transportation and, lacking a top or operable windows and doors, was completely exposed to the view of law enforcement personnel and elements of the public.* Next, we consider that Naval police, like the authorities in most jurisdictions (see, e.g., Title 46.1–401 Code of Virginia (1980)), are specifically required to investigate serious motor vehicle accidents. OPNAV Instruction 11200.5B, para. 4–6a (2) (1973). Finally, we consider that the accident resulted in a fatality. Under such circumstances, we conclude that no one could reasonably expect that his vehicle would not be thoroughly examined.

We of course do not imply that appellant forfeited any other right, title, or interest in the vehicle. We only hold that his legitimate expectation of privacy had terminated. Therefore, we conclude that the authorities invaded no constitutionally protected interest of appellant, and that, under the circumstances, a search warrant was not required.

Accordingly, the military judge did not err in receiving the challenged evidence; and the decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Chief Judge EVERETT and Judge FLETCHER concur.

---

* This case is distinguishable from *United States v. Armstrong*, 9 M.J. 374 (C.M.A.1980), where the Government relied in part on a spurious "inventory" to justify the search of the vehicle. Moreover, the search there was for drugs which American law enforcement personnel apparently believed to be concealed in the car. Here, the search was connected with the manner of operation of the car and with the events which had led to its being left in a severely damaged condition on the grounds of the Naval Academy.