## SITZ v DEPARTMENT OF STATE POLICE

Docket No. 93851. Argued March 2, 1993 (Calendar No. 5). Decided
September 14, 1993.

Rick Sitz and several other licensed Michigan drivers brought an
action in the Wayne Circuit Court against the Department of
State Police and its director, Gerald L. Hough, seeking to
enjoin the use of sobriety checkpoints at certain sites along
state highways. Following a bench trial, the court, Michael L.
Stacey, J., found that the checkpoints violated both the Fourth
Amendment of the United States Constitution and art 1, § 11 of
the Michigan Constitution and permanently enjoined their
implementation. The Court of Appeals, GRIBBS, P.J., and D. E.
HOLBROOK, JR., and N. J. LAMBROS, JJ., affirmed, ruling that
the checkpoints violated the Fourth Amendment, and thus
finding it unnecessary to decide if the state constitution offered
greater protection (Docket No. 93823). The Michigan Supreme
Court denied leave to appeal, 432 Mich 872 (1989). The United
States Supreme Court, reversed, finding that the sobriety
checkpoint program did not violate the Fourth Amendment,
496 US 444 (1990). On remand, the Court of Appeals, D. E.
HOLBROOK, JR., and McDONALD, JJ. (GRIBBS, P.J., dissenting),
affirmed, holding that the indiscriminate stopping of motor
vehicles without suspicion in the form of roving roadblocks
violates art 1, § 11 of the Michigan Constitution (Docket No.
131032). The State Police appeal.

In an opinion by Justice BOYLE, joined by Justices LEVIN,
RILEY, and MALLETT, the Supreme Court *held:*

Sobriety checkpoints violate art 1, § 11 of the Michigan
Constitution.

1. The protections afforded by the Michigan Constitution and
the United States Constitution in a given instance may be
greater, lesser, or the same. While Michigan courts should
reject unprincipled creation of rights under the state constitu-
tion that exceed federal counterparts, courts are not obligated
to accept major limitations of protection provided under the
Michigan Constitution simply because the United States Su-
preme Court has chosen to do so with respect to the federal
constitution. Rather, the Michigan Constitution is to be inter-

preted in light of the intent of its framers and its jurisprudential history.

2. Viewed in such a light, Const 1963, art 1, § 11, in the context of automobile seizures, extends more expansive protection than the federal constitution as interpreted by the United States Supreme Court. Historically, searches and seizures for criminal investigatory purposes have been treated differently than those for regulatory or administrative purposes. While administrative or regulatory searches and seizures in the absence of suspicion have traditionally been regarded as reasonable in a constitutional sense, seizures with the primary goal of enforcing the criminal law generally have required some level of suspicion. Precedent regarding seizures and searches of automobiles implicitly incorporates a balancing test that is inherent in assessing their reasonableness. Seizures of vehicles for criminal investigation without suspicion, and extreme deference to the judgments of politically accountable officials, is contrary to Michigan constitutional precedent.

Chief Justice CAVANAGH concurred only in the result.

Affirmed.

Justice BRICKLEY, joined by Justice GRIFFIN, dissenting, stated that Michigan's sobriety checkpoint program withstands scrutiny under art 1, § 11 of the Michigan Constitution.

This case is not about the standard governing the seizure of a particular driver for a particular reason; rather, it concerns the standard governing the systematic seizure of every vehicle passing through a given point at a given time. The reasonableness of a seizure less intrusive than an arrest depends upon a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.

When reviewing the constitutionality of a seizure, courts must weigh the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty, and assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions. On balance, the state's interest in eradicating the problem of drunk driving and the reasonable manner in which sobriety checkpoints further that goal outweighs the minimal intrusion by the checkpoints on motorists who are only momentarily stopped.

193 Mich App 690; 485 NW2d 135 (1992) affirmed.

*Mark Granzotto, Deborah L. Gordon,* and *William Gage,* for the plaintiffs.

*Frank J. Kelley,* Attorney General, and *Thomas L. Casey,* Solicitor General, for the defendants.

Amici Curiae:

*Rizik & Rizik, P.C.* (by *Michael B. Rizik, Jr.*), for MADD Michigan.

*John R. Minock* for Criminal Defense Attorneys of Michigan.

*Pepper, Hamilton & Scheetz* (by *Abraham Singer*), and *Robert Teir,* General Counsel, for American Alliance for Rights and Responsibilities.

*Varnum, Riddering, Schmidt & Howlett* (by *Joseph J. Vogan*), and *Michele McDowell Fields* and *Stephen L. Oesch,* for the Insurance Institute for Highway Safety, the Alliance of American Insurers, Allstate Insurance Company, the American Insurance Association, Amica Mutual Insurance Company, Farmers Insurance Group of Companies, Liberty Mutual Group, Lumbermens Mutual Casualty Company, National Association of Independent Insurers, Nationwide Mutual Insurance Company, Progressive Casualty Insurance Company, Prudential Property and Casualty Insurance Company, Royal Insurance, State Farm Mutual Automobile Insurance Company, the Travelers Indemnity Company, and United Services Automobile Association.

BOYLE, J. The case before us concerns a challenge to the use of sobriety checkpoints by the Michigan State Police. The United States Supreme Court held that the checkpoint scheme does not constitute a violation of the Fourth Amendment of the United States Constitution. *Michigan Dep't of*

*State Police v Sitz,* 496 US 444; 110 S Ct 2481; 110 L Ed 2d 412 (1990). On remand from that Court, a two-judge majority of the Michigan Court of Appeals determined that sobriety checkpoints violate art 1, § 11 of the Michigan Constitution. Because there is no support in the constitutional history of Michigan for the proposition that the police may engage in warrantless and suspicionless seizures of automobiles for the purpose of enforcing the criminal law, we hold that sobriety checklanes violate art 1, § 11 of the Michigan Constitution.

I

The following facts in this case are undisputed and are set forth in the Court of Appeals opinion, 170 Mich App 433, 435-437; 429 NW2d 180 (1988):

> 1982 PA 310 established the Michigan Drunk Driving Task Force in the Department of State Police, MCL 257.625j; MSA 9.2325(10). The Task Force was charged with reviewing all aspects of the drunk driving problem in the state. In September, 1985, the Task Force submitted its final report which set forth thirty-five recommendations for combating alcohol-related traffic accidents. One suggestion was the implementation of sobriety checkpoints on public highways. Due to legislative opposition, defendants did not attempt to implement sobriety checkpoints at that time.
>
> In his State of the State Address on January 29, 1986, Governor Blanchard directed defendants to implement a sobriety checkpoint pilot program. In February, 1986, defendant Gerald L. Hough, Director of the Michigan Department of State Police, appointed a Sobriety Checkpoint Advisory Committee, composed of representatives of the State Police, local law enforcement officials, prosecuting attorneys, and the University of Michigan Transportation Research Institute. The committee drafted guidelines for the program. The guidelines

set forth procedures as to site selection, publicity, and operation of the checkpoint, including briefing, scheduling, safety considerations, motorist contact, staffing and assignment of duties.

Under the program, checkpoints would be established at certain sites along state highways. All motorists would be stopped upon reaching a checkpoint and would be examined for signs of intoxication. Should the examining officer find indications of intoxication, the officer would direct the driver to an out-of-traffic location, check the driver's license and car registration, and possibly conduct further sobriety tests, including a Breathalyzer test. If the officer concluded that the driver was intoxicated, the officer would have discretion to arrest the driver; should the officer conclude the driver was not intoxicated, the driver was to be released.

The first sobriety checkpoint operation was conducted at Dixie Highway and Gretchen Road in Saginaw County on May 17 and 18, 1986. The Saginaw County Sheriff's Department coöperated in the operation which lasted from about 11:45 P.M. to 1:00 A.M. One hundred twenty-six vehicles passed though the checkpoint in that time, with an average delay to motorists of twenty-five seconds or less. Two drivers were retained for sobriety field tests; one was arrested for driving while under the influence of alcohol. A third driver drove through the checkpoint without stopping, was pulled over by an officer in an observation vehicle, and was arrested for driving under the influence.

This action was commenced on May 16, 1986, with the filing of plaintiffs' complaint for a declaratory judgment and injunctive relief. Plaintiffs are licensed drivers of the State of Michigan who regularly travel throughout the state in their automobiles. During the course of the initial proceedings, defendants agreed to delay implementation of the sobriety checkpoint program pending resolution of the case.

Trial took place from May 29, 1986, through

June 3, 1986. In its opinion dated June 24, 1986, the trial court found that, although there was statutory authority for the operation of the sobriety checkpoints, the plan violated the Fourth Amendment to the United States Constitution and art 1, § 11 of the Michigan Constitution.

On August 1, 1988, the Court of Appeals unanimously affirmed the trial court's ruling that the sobriety checkpoints violated the Fourth Amendment, finding it unnecessary to decide if the state constitution offered greater protection.

Following a denial of leave to appeal to this Court, 432 Mich 872 (1989), the defendants appealed to the United States Supreme Court, which granted certiorari. The United States Supreme Court reversed the decision of the Court of Appeals, finding that the Michigan sobriety checkpoint program did not violate the Fourth Amendment of the United States Constitution.[1]

On remand, the Court of Appeals held that "the indiscriminate suspicionless stopping of motor vehicles in the form of roving roadblocks violat[es] art 1, § 11 of the Michigan Constitution." 193 Mich App 690, 699; 485 NW2d 135 (1992). This Court granted leave to appeal, 441 Mich 869 (1992).

II

At the outset, we note, as did the United States

---

[1] The United States Supreme Court observed:

In sum, the balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program. We therefore hold that it is consistent with the Fourth Amendment. The judgment of the Michigan Court of Appeals is accordingly reversed, and the cause is remanded for further proceedings not inconsistent with this opinion. [*Sitz*, 496 US 455.]

Supreme Court, that this case involves a facial challenge to the constitutionality of the checkpoint program:

> It is important to recognize what our inquiry is *not* about. No allegations are before us of unreasonable treatment of any person after an actual detention at a particular checkpoint. See [*United States v Martinez-Fuerte,* 428 US 543, 559; 96 S Ct 3074; 49 L Ed 2d 1116 (1976)] ("claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review"). As pursued in the lower courts, the instant action challenges only the use of sobriety checkpoints generally. We address only the initial stop of each motorist passing through a checkpoint and the associated preliminary questioning and observation by checkpoint officers. Detention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard. [*Sitz,* 496 US 450-451. Emphasis in the original.]

Because the United States Supreme Court established that Michigan's sobriety checkpoints do not violate the Fourth Amendment of the United States Constitution, the specific question presented in this case is whether sobriety checkpoints are unreasonable under art 1, § 11 of the Michigan Constitution. Before addressing this issue, we must first address the more fundamental question, how we interpret the Michigan Constitution.

A

During the decade of United States Supreme Court jurisprudence "commonly characterized as the 'criminal law revolution of the Warren Court,' " the Supreme Court "rapidly extend[ed] the reach of various constitutional provisions ap-

plicable to the criminal justice process . . . ."
1 LaFave & Israel, Criminal Procedure, § 2.1, p 56
and n 1. Subsequent decisions of the Burger Court
were characterized by some commentators as pull-
ing back from, suspending, or weakening the scope
of constitutional protections, including the specific
guarantees of the Bill of Rights. In 1977, Justice
William J. Brennan, the "patron saint of the
revival of interest in state constitutional law,"[2]
commented on the "trend" in a landmark article,
urging state activism in interpretation of state
law:

> [T]he very premise of the cases that foreclose
> federal remedies constitutes a clear call to state
> courts to step into the breach. With the federal
> locus of our double protections weakened, our
> liberties cannot survive if the states betray the
> trust the Court has put in them. And if the trust
> is, for the Court, strong enough to override the
> risk that some states may not live up to it, how
> much more strongly should we trust state courts
> whose manifest purpose is to expand constitutional
> protections. With federal scrutiny diminished,
> state courts must respond by increasing their own.
> [Brennan, *State constitutions and the protection of
> individual rights,* 90 Harv L R 489, 503 (1977).]

The movement Justice Brennan heralded and
strengthened with his article came to be called
"New Federalism." One commentator has noted:

> Today's New Federalism movement has its roots
> in two phenomena. The first is the liberal reaction
> in the mid-1970s to the jurisprudence of the
> Burger Court. As the Burger Court slowed the
> expansion of constitutionally protected individual
> rights begun by the Warren Court, many liberals

---

[2] Maltz, *False prophet—Justice Brennan and the theory of state
constitutional law,* 15 Hastings Const L Q 429 (1988).

began to look to state courts to take up the War-
ren Court's legacy in the form of rights-protective
state constitutional rulings. The second phenome-
non is a much older and sparser tradition of
criticizing state courts for ignoring state constitu-
tions as a source of law and for failing to develop
vigorous and independent bodies of state constitu-
tional law irrespective of the character of the
constitutional jurisprudence of the U. S. Supreme
Court. [Gardner, *The failed discourse of state con-
stitutionalism,* 90 Mich L R 761, 771 (1992).]

Awakened to the potential for a reappraisal of
claims based on state constitutional grounds, mem-
bers of the Michigan bar joined their colleagues
across the country[3] in pressing claims seeking
interpretations of state law that provided more
expansive criminal procedure protections than
those recognized under federal law. By 1983, the
number of rights-expansive claims based on state
law had proliferated to the point that guidance
from this Court was deemed both appropriate and
necessary.

Thus, in *People v Nash,* 418 Mich 196; 341
NW2d 439 (1983), the Court conducted the first
modern-day comprehensive survey of the circum-
stances surrounding the creation of Const 1963,
art 1, § 11 to determine whether our constitution
required a higher level of search and seizure pro-
tection than the Fourth Amendment of the United
States Constitution. Our conclusion in *Nash,* that
"[t]he history of Const 1963, art 1, § 11, and its
plain import, . . . suggest that its further
expansion . . . should occur only when there is a
compelling reason to do so," *id.* at 214, was in-
tended to clarify for the bench and bar that claims
that art 1, § 11 should be interpreted more expan-
sively than the Fourth Amendment must rest on

---

[3] Gardner, *supra* at 776.

more than a disagreement with the United States Supreme Court.

### B

Our analysis in *Nash* began by noting that the federal and state constitutional provisions that forbid unreasonable searches and seizures are nearly identical.[4] The primary difference, and the center of the debate surrounding the adoption of a search and seizure provision, was the anti-exclusionary-rule proviso first added to the Michigan Constitution of 1908, art 2, § 10, by amendment in 1936:

Provided, however, That the provisions of this section shall not be construed to bar from evidence in any court of criminal jurisdiction, or in any criminal proceeding held before any magistrate or justice of the peace, any firearm, rifle, pistol, revolver, automatic pistol, machine gun, bomb, bomb shell, explosive, blackjack, slungshot, billy, metallic knuckles, gas-ejecting device, or any other dan-

---

[4] US Const, Am IV provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Const 1963, art 1, § 11 provides:

The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state.

gerous weapon or thing, seized by any peace officer outside the curtilage of any dwelling house in the state. [1935 Joint Resolution No 1, ratified November 3, 1936.][5]

The convention focus on retention of the proviso was prompted by the decision of the United States Supreme Court in *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), applying the exclusionary rule to the states.[6] The *Nash* Court discussed at length the legislative debate:

The focus of the Michigan Constitutional Convention of 1961 was on the effect of *Mapp* on the third sentence of Const 1908, art 2, § 10. The Committee on Declaration of Rights, Suffrage, and Elections proposed that the final sentence of Const 1908, art 2, § 10 be deleted in favor of the phrase "Evidence obtained in violation of this section shall not be used except as authorized by law." The committee reasoned that the broad holding of *Mapp* may have invalidated the final sentence of Const 1908, art 2, § 10. The merits of that sentence were also considered by the committee. The committee added the phrase "except as authorized by law" because:

"Should the definition of the federal limits imposed on the States with respect to the admissibility of evidence change in the future, the Michigan Legislature and the Michigan courts could incorporate, in statute and court decisions, those rules with respect to the admissibility of evidence which reflect the opinion of the Legislature and the Michigan courts as to what ought to constitute sound practice in this State, subject only to the

[5] In 1952, the phrase "any narcotic drug or drugs" was added to the proviso. 1952 Joint Resolution No 1, ratified November 4, 1952.

[6] The Fourth Amendment of the United States Constitution was not applied to the states until 1949. See *Wolf v Colorado,* 338 US 25; 69 S Ct 1359; 93 L Ed 1782 (1949) (Fourth Amendment privacy rights are implicit in the concept of ordered liberty and thus enforceable against the states through the Due Process Clause).

continuing recognition of the limits set by federal constitutional supremacy." Committee Proposals and Reports, Constitutional Convention 1961, Supporting Report, Committee Proposal No 15, pp 7, 10.

It therefore appears that the committee was attempting to allow for the possibility of a less stringent application of the exclusionary rule if allowed by federal law, rather than attempting to strengthen Michigan search and seizure protection.

The debates of the committee of the whole at the convention considered both the merits of, and the effect of *Mapp* on, Const 1908, art 2, § 10. See 1 Official Record, Constitutional Convention 1961, pp 464-484, 488-533, 674-688. The view that *Mapp* was limited to searches of dwellings and that a limitation on the exclusionary rule was proper on the merits carried the day. Attempts to unite Michigan and United States search and seizure law by adopting the exact language of the Fourth Amendment in the proposed Michigan Constitution were defeated. Instead, the anti-exclusionary-rule proviso of Const 1908, art 2, § 10 was amended back into the proposed constitution. 1 Official Record, Constitutional Convention 1961, pp 531-688. Ultimately, language substantially similar to that of Const 1908, art 2, § 10, as amended, was adopted by the convention and recommended to the people.

The convention's address to the people stated that proposed Const 1963, art 1, § 11 was "No change from Sec. 10, Article II, of the present constitution except for improvement in phraseology." 2 Official Record, Constitutional Convention 1961, p 3364. Indeed, the common understanding of the people upon reading the proposed constitutional provision could be nothing but the belief that the search and seizure provision of the new constitution represented no change. There had been no substantive alterations. There is no indication that in readopting the language of Const 1908, art 2, § 10 in Const 1963, art 1, § 11 the people of this state wished to place restrictions on law en-

forcement activities greater than those required by the federal constitution. In fact, the contrary intent is expressed. [*Id.* at 211-213.]

The historical analysis found in *Nash* is unassailable. The creators of Const 1963, art 1, § 11 were forcefully asserting state sovereignty by reacting to the *Mapp* decision with the readoption of the limited anti-exclusionary-rule proviso. At the same time, they were reiterating the venerable standard of reasonableness for seizures and an exclusionary remedy that preceded the full federalization of the Fourth Amendment by forty-two years.[7] On the basis of the historical reality surrounding the adoption of art 1, § 11, this Court concluded in words we repeat for their import on our present inquiry:

When the people of this state adopted the third sentence of Const 1963, art 1, § 11, they also adopted the first two. Those sentences, nearly identical to those contained in the Fourth Amendment, had been part of Michigan's Constitutions since 1835. See Const 1835, art 1, § 8; Const 1850, art 6, § 26. It was under those sentences that this Court created a body of state constitutional search and seizure law and adopted an exclusionary rule, all before either was subject to a federal floor. We cannot necessarily view the final sentence of Const 1963, art 1, § 11 as an interdiction against evolving concepts of reasonableness under the first two sentences. Though the people of the State of Michigan have corrected this Court when they have believed it to have gone too far, the historical general power of this Court to construe the constitutional provision relating to searches and seizures

---

[7] In *People v Marxhausen*, 204 Mich 559; 171 NW 557 (1919), this Court became one of the first courts in the country to apply the federal exclusionary rule to exclude unlawfully seized evidence in the courts of our state. See also *Weeks v United States*, 232 US 383; 34 S Ct 341; 58 L Ed 652 (1914).

has not been removed. The history of Const 1963, art 1, § 11, and its plain import, however, suggest that its further expansion, with the concomitant expansion of the exclusionary rule to enforce it,[8] should occur only when there is a compelling reason to do so. [*Id.* at 214.]

This analysis has been applied consistently since *Nash.*[9]

[8] The *Nash* Court explicitly declined to limit the compelling reason test to questions involving the exclusionary rule:

> Our brother, Justice CAVANAGH, in dissenting to this analysis, is correct when he notes that the standard of reasonableness and the application of the exclusionary rule under the Michigan Constitution should be analytically separate inquiries. Unfortunately, the assumption that the standard of reasonableness and the remedy for breach of that standard are inexorably linked permeates prior decisions of this Court. This Court's statement in [*People v Moore,* 391 Mich 426; 216 NW2d 770 (1974)], that the anti-exclusionary-rule proviso of art 1, § 11 precluded a standard of reasonableness higher than that of the federal constitution when weapons or narcotics are involved likewise makes this analytically incorrect assumption. [*People v Secrest,* 413 Mich 521; 321 NW2d 368 (1982)] merely expanded on that incorrect assumption to state that when weapons or narcotics are not involved, the standard of reasonableness for searches that reveal all other items must be higher.
>
> We, therefore, are left with whether our analysis of issues involving standard of reasonableness and the anti-exclusionary-rule proviso should be as it has been or as it should be. Were we writing on a blank slate, we would separate our analyses of whether the Michigan Constitution has been violated and whether that violation calls for application of the Michigan common-law exclusionary rule. To do so now, however, would necessitate overruling both *Moore* and *Secrest.* [*Id.* at 215, n 4.]

[9] See *People v Collins,* 438 Mich 8, 25; 475 NW2d 684 (1991):

> Discerning the intent of the framers and the people who adopted Const 1963, art 1, § 11, this Court has held . . . that art 1, § 11 is to be construed to provide the same protection as that secured by the Fourth Amendment, absent "compelling reason" to impose a different interpretation.

And *id.* at 29, n 34, citing:

> *People v Smith* [420 Mich 1, 20; 360 NW2d 841 (1984)] (no

C

Today we clarify that the compelling reason test must be interpreted in the context of our observation that the proviso should not be read as "an interdiction" of the first two clauses, under which this Court "created a body of state constitutional search and seizure law and adopted an exclusionary rule, all before either was subject to a federal floor." *Nash, supra* at 214. Thus, "compelling reason" should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law. As illustrated by the question presented today, a literal application of the term would force us to ignore the jurisprudential history of this Court in favor of the analysis of the United States Supreme Court announced in *Sitz.* Properly understood, the *Nash* rule compels neither the acceptance of fed-

compelling reason that Const 1963, art 1, § 11 requires a standing requirement, for purposes of challenging the admissibility of evidence seized without a warrant, more liberal than that mandated by the United States Supreme Court's interpretation of the Fourth Amendment); *People v Catania* [427 Mich 447; 398 NW2d 343 (1986)] (plurality decision which followed the analysis set forth in *Nash, supra,* in holding that art 1, § 11 did not require suppression of evidence seized pursuant to a warrantless "ruse" entry by an undercover police agent into the defendant's home because parallel federal constitutional provisions had been interpreted to permit the use of such evidence); *People v Perlos* [436 Mich 305; 462 NW2d 310 (1990)] (MCL 257.625a[9]; MSA 9.2325[1][9], which permits chemical analysis of blood samples taken from a driver of a motor vehicle involved in an accident to be admitted into evidence in a subsequent criminal prosecution arising out of such accident, does not violate the Fourth Amendment of the federal constitution and there is "no compelling reason" to afford greater protection under Const 1963, art 1, § 11).

See also *id.* at 40 (there is no compelling reason to interpret Const 1963, art 1, § 11 to prohibit participant monitoring without a warrant where it does not violate the Fourth Amendment); *People v Faucett,* 442 Mich 153; 499 NW2d 764 (1993) (the Michigan Constitution does not provide more protection than the federal constitution when determining the validity of an anonymous informant's tip).

eral interpretation nor its rejection. In each instance, what is required of this Court is a searching examination to discover what law "the people have made." *People v Harding,* 53 Mich 481, 485; 19 NW 155 (1884).

The judiciary of this state is not free to simply engraft onto art 1, § 11 more "enlightened" rights than the framers intended. By the same token, we may not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection.

III

The Constitution of 1963, art 1, § 11 does not confer a right upon Michigan citizens to exclude unreasonably seized weapons or narcotics discovered outside the curtilage of a dwelling house. As noted in *Nash, supra* at 212, "The view that *Mapp* was limited to searches of dwellings and that a limitation on the exclusionary rule was proper on the merits carried the day." It was not until after adoption of the proviso that it became clear that the Fourth Amendment of the United States Constitution does confer such a right.

Under the Supremacy Clause, the courts of this state are obliged to enforce the rights conferred by the United States Supreme Court even if the state constitution does not provide such rights.[10] Thus, in *People v Pennington,* 383 Mich 611, 620; 178

---

[10] Article VI, cl 2, of the United States Constitution provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

NW2d 471 (1970), the Court recognized that "the anti-exclusionary provision of Article 1, § 11, Michigan Constitution of 1963, cannot, under Federal decisions, stand against the Fourth and Fourteenth Amendments to the United States Constitution and the decision in *Mapp*."[11] However, while the Court in *Pennington* correctly recognized the supremacy of federal law, the conclusion that the proviso itself was unconstitutional was based on an incorrect premise.

The Michigan Declaration of Rights, like the federal Bill of Rights, is "drawn to restrict governmental conduct and to provide protection from governmental infringement and excesses . . . ." *Woodland v Citizens Lobby*, 423 Mich 188, 204; 378 NW2d 337 (1985). When there is a clash of competing rights under the state and federal constitutions, the Supremacy Clause, art VI, cl 2, dictates that the federal right prevails. Where a right is given to a citizen under federal law, it does not follow that the organic instrument of state government must be interpreted as conferring the identical right. Nor does it follow that where a right given by the federal constitution is not given by a state constitution, the state constitution offends the federal constitution. It is only where the organic instrument of government purports to deprive a citizen of a right granted by the federal

---

[11] As the *Pennington* Court observed at 618, federal courts had not hesitated to reverse Michigan courts that failed to recognize the supremacy of federal law. In *Winkle v Kropp*, 279 F Supp 532, 539 (ED Mich, 1968), rev'd on other grounds 403 F2d 661 (CA 6, 1968), Federal District Judge Wade McCree held:

Whatever innovations might be devised in the area of searches and seizures, it would seem that one thing which cannot be done is to justify a search by its results. It must therefore be held that the proviso, *as applied in this case,* is violative of the Fourth Amendment. [Emphasis added.]

constitution that the instrument can be said to violate the constitution.

On its face, the anti-exclusionary-rule provision does not purport to deprive an individual of a right guaranteed under the federal constitution. The intent of the framers of the proviso as originally adopted was to affirm and limit the application of the exclusionary rule. The intent of the framers of art 1, § 11, as readopted, was to reaffirm the "same" principles and prevent Michigan courts from using the state constitution to extend the federally declared exclusionary right granted under *Mapp.* No conflict of rights exists between the last sentence of art 1, § 11 and the Fourth Amendment because the Michigan Constitution as enacted simply failed to extend the federal right to certain categories of evidence.

Because the anti-exclusionary-rule provision does not purport to deprive a Michigan citizen of a federally guaranteed right, a conflict exists under art 1, § 11 and the Fourth Amendment only when state courts ignore the rights conferred by the United States Constitution and admit into evidence items unreasonably seized under the Fourth Amendment. It is by virtue of such state action that the Supremacy Clause is offended.

Thus, appropriate analysis of our constitution does not begin from the conclusive premise of a federal floor.[12] Indeed, the fragile foundation of the

---

[12] As one commentator observes:

The image of federal constitutional law as a "floor" in state court litigation pervades most commentary on state constitutional law. Commentators contend that in adjudicating cases, state judges must not adopt state constitutional rules which fall below this floor; courts may, however, appeal to the relevant state constitution to establish a higher "ceiling" of rights for individuals. . . .

Certainly, as a matter of federal law, state courts are bound not to apply any rule which is inconsistent with decisions of the

federal floor as a bulwark against arbitrary action is clearly revealed when, as here, the federal floor falls below minimum state protection. As a matter of simple logic, because the texts were written at different times by different people, the protections afforded may be greater, lesser, or the same.[13]

The statement in *Collins* that art 1, § 11 will be construed to provide the same protection as the United States Supreme Court's interpretation of the Fourth Amendment should not be understood as having created a ladder of precedent that is contrary to the language of the Michigan Constitution. Nor should the statement be read to require us to ignore the "body of state constitutional search and seizure law" created pursuant to "the

---

Supreme Court; the Supremacy Clause of the Federal Constitution clearly embodies this mandate. It would be a mistake, however, to view federal law as a floor for state constitutional analysis; principles of federalism prohibit the Supreme Court from dictating the content of state law. In other words, state courts are not required to incorporate federally-created principles into their state constitutional analysis; the only requirement is that in the event of an irreconcilable conflict between federal law and state law principles, the federal principles must prevail.

\* \* \*

[S]uch courts must undertake an independent determination of the merits of each claim based solely on principles of state constitutional law. If the state court begins its analysis with the view that the federal practice establishes a "floor," the state court is allowing a federal governmental body—the United States Supreme Court—to define, at least in part, rights guaranteed by the state constitution. Thus, to avoid conflict with fundamental principles of state autonomy, a state court deciding whether to expand federally recognized rights as a matter of state law must employ a two-stage process. The court first must determine whether the federally recognized rights themselves are incorporated in the state constitution and *only then* must determine whether those protections are more expansive under state law. [Maltz, n 2 *supra* at 443-444. Emphasis in the original.]

[13] *Ex parte Tucci,* 859 SW2d 1 (Tex, 1993). *Davenport v Garcia,* 834 SW2d 4 (Tex, 1992); *Oregon v Smith,* 301 Or 681; 725 P2d 894 (1986).

historical general power of this Court to construe the constitutional provision relating to searches and seizures . . . ." *Nash, supra* at 214.

The historical review required when analyzing the constitution as articulated in *People v Catania,* 427 Mich 447, 466; 398 NW2d 343 (1986), and *Collins, supra* at 31, illustrates[14] that we did not intend to obscure the appropriate inquiry regarding the constitutional role of the courts of this state. The "compelling reason" test is a convenient formulation of the overarching responsibility to find a principled basis in the history of our jurisprudence for the creation of new rights. What is to be gleaned from our former cases is that the courts of this state should reject unprincipled creation of state constitutional rights that exceed their federal counterparts. On the other hand, our courts are not obligated to accept what we deem to be a major contraction of citizen protections under our constitution simply because the United States Supreme Court has chosen to do so. We are obligated to interpret our own organic instrument of government.

We now turn to the crux of the instant case: whether sobriety checkpoints are unconstitutional under the Michigan Constitution.

IV

Over one hundred years ago, Chief Justice

---

[14] Both cases listed several factors as being helpful in "determining whether a state constitution affords protection different from the federal constitution." *Collins* at 31, n 39:

1) the textual language of the state constitution, 2) significant textual differences between parallel provisions of the two constitutions, 3) state constitutional and common-law history, 4) state law preëxisting adoption of the relevant constitutional provision, 5) structural differences between the state and federal constitutions, and 6) matters of peculiar state or local interest.

COOLEY set forth the judiciary's task in construing the Michigan Constitution:

> [I]n seeking for its real meaning we must take into consideration the times and circumstances under which the State Constitution was formed— the general spirit of the times and the prevailing sentiments among the people. Every constitution has a history of its own which is likely to be more or less peculiar; and unless interpreted in the light of this history, is liable to be made to express purposes which were never within the minds of the people in agreeing to it. This the court must keep in mind when called upon to interpret it; for their duty is to enforce the law which the people have made, and not some other law which the words of the constitution may possibly be made to express. [*People v Harding, supra* at 485.]

The intent of the framers as expressed to the people of Michigan was that the Constitution of 1963 represented "no change" from the Constitution of 1908. Thus, to understand what art 1, § 11 means regarding suspicionless seizures of automobiles, and, thus, what level of protection is required under the Michigan Constitution, we look to interpretation of the previous, nearly identical, constitutional provision. A review of the cases construing Const 1908, art 2, § 10 discloses no support for the proposition that the police may engage in warrantless, suspicionless seizures of automobiles.

A

What is legally required to seize and search an automobile is not a new question in Michigan.

During Prohibition,[15] this Court had many opportunities to review the level of cause necessary to make such a stop or search.

In *People v Case,* 220 Mich 379; 190 NW 289 (1922), this Court determined that a warrant was not a prerequisite to the valid search of an automobile. In arriving at this conclusion, the Court discussed its constitutional role in determining the "reasonableness" of a search or seizure:

> Whether search of and seizure from an automobile upon a highway or other public place without a search warrant is unreasonable is in its final analysis to be determined as a judicial question in view of all the circumstances under which it is made. [*Id.* at 389.]

In arriving at this conclusion, the Court took guidance from federal authority:

> The generally recognized rule is fairly stated in the following annotation to 11 Fed Stat Ann (2d ed), p 354:
> "The question whether a seizure or a search is unreasonable in the language of the Constitution is a judicial and not a legislative question; but in determining whether a seizure is or is not unreasonable, all of the circumstances under which it is made must be looked to." [*Id.* at 388.]

While the federal decisions that lead to this annotation were no more binding on the Michigan Supreme Court than the decisions of the Ohio Supreme Court, this Court chose to adopt their reasoning as instructive.

*Case* was relied on and explained two years later

---

[15] On a full review of this turbulent period, one cannot help but be struck by the similarities of the arguments made for and against the rights of citizens versus the needs of law enforcement to the modern-day necessity of dealing with drug running and drunken driving.

in *People v Kamhout,* 227 Mich 172; 198 NW 831 (1924). In upholding the search of an automobile, the Court articulated a search and seizure standard that came to be generally applied in future cases involving automobiles:[16]

> There must be no misunderstanding on the part of officers as to the right of search and arrest under our holdings. They have no right *to stop* and search an automobile or other conveyance for the purpose of ascertaining whether it is being used as a means of transporting liquor illegally unless they have such reasonable grounds of suspicion as induce in them, and as would induce in any prudent man, an honest belief that the law is being violated. . . . What we do state to be the rule by which this court will be governed is, that if an officer, charged with the enforcement of the law, from the exercise of his own senses, or acting upon information received from sources apparently so reliable that a prudent and careful person, having due regard for the rights of others, would act thereon, has reasonable and probable cause to believe that intoxicating liquor is being unlawfully transported in an automobile in his presence, he may arrest the offender or search for and, if found, seize the contraband therein without a warrant to do so. [*Id.* at 187-188. Emphasis added.]

*Kamhout*'s observation that "reasonable grounds" are required by the Michigan Constitution before the seizure or search of an automobile may occur, remains unmodified by precedent.

In *People v Roache,* 237 Mich 215; 211 NW 742 (1927), this Court was presented with, but did not directly decide, "Whether an officer may stop, indiscriminately, travelers on the highway and demand of them that they produce license cards is a question we do not and need not determine." *Id.*

---

[16] In *People v Krahn,* 230 Mich 528; 203 NW 105 (1925), this Court applied the *Kamhout* language to a team and wagon.

at 219 (CLARK, J., dissenting).[17] While the majority rested its decision on the lack of reasonable grounds for the search of the automobile, the Court discussed the grounds needed to justify a search and seizure:

> No one will contend that an officer may promiscuously stop automobiles upon the public highway and demand the driver's license merely as a subterfuge to invade the constitutional right of the traveler to be secure against unreasonable search and seizure. Yet that is exactly what was done here. The officer cared nothing about seeing a driver's license, but he says he was suspicious that there was liquor in the car, and almost immediately after stopping the defendant he ordered him out of his car and proceeded to search it for liquor. [*Id.* at 222.][18]

After applying *Kamhout,* and dismissing the search and seizure justifications of the officers as lacking reasonable grounds, the Court concluded with a warning as appropriate today as it was in 1927:

> While we may take judicial notice of the fact that rum runners and bandits ride in automobiles, and use them to commit crimes and effect their escape, may we not also take judicial notice of the fact that where there is one bandit or rum runner passing over a public highway, there are thou-

---

[17] The driver's license statute at that time required:

> Said license card or tag shall at all times be carried by the licensee when he or she is operating a motor vehicle along the public highways of this state and shall be given up by him or her for examination upon demand by any proper officer. [1923 PA 186, § 4.]

[18] The majority's anger that the license stop would be used as a pretext to conduct criminal investigative activities differs from the present case. Here, the state has failed to enunciate a pretext.

sands of respectable, law-abiding citizens who are
doing likewise? The protection afforded by the
Constitution to such persons must be regarded as
paramount to any right to be given a police officer
to enable him to verify his ungrounded suspicion
that a law is being violated.

The granting, if such a thing were possible, to
over-zealous officers, of powers, the performance of
which would invade constitutional rights of the
citizen, would do more to retard the enforcement
of law than to promote it. [*Id.* at 224-225.]

Perhaps the most famous, or infamous opinion,
depending on perspective, to discuss the relation-
ship between the search and seizure provision of
Michigan and the automobile is *People v Stein,*
265 Mich 610; 251 NW 788 (1933), the case that
led to the amendment of Const 1908, art 2, § 10.

The amendment, the addition of the anti-
exclusionary-rule proviso, was a response by the
people of Michigan to the *Stein* Court's use of the
exclusionary rule to reverse a conviction, which
relied on an unconstitutionally seized weapon. The
proviso, while casting doubt on the *Stein* Court's
view of the exclusionary rule, does not invalidate
its analysis of the reasonableness of the stop.

The issue in *Stein* was "whether the arrest was
lawful because the search was based solely upon
the arrest [the suspicion for which was the speed
of the car and a furtive gesture]. The essential
question before us is whether the arrest was justi-
fied as a matter of law." *Id.* at 613. The Court
began its analysis by quoting from both *Kamhout*
and *Roache,* observing of the former

[that the rule from that case] was made with full
appreciation of the use of automobiles in criminal
operations, the proclivity of law-breakers to carry
weapons, the developed faculties of police officers
to detect crime, the attitude of law-abiding citizens

toward the enforcement of the law, and also with the realization of the court that the constitutional provision is a mandate and must be preserved for the benefit of good citizens, although, as is usually the case when it reaches the court, it is invoked in favor of the law-breaker.

*   *   *

If conditions demand a special rule of search on highways, the remedy is by amendment of the Constitution. [*Stein, supra* at 613-615.]

The Court then focused on the level of proof required for the arrest that led to the search. The majority noted:

If, instead of arresting defendants, the officers had searched the cab, but not the persons or baggage of defendants, it may be that defendants could not have complained. The mistake the officers made was in arresting defendants before they had reasonable ground to believe that a crime was being committed by defendants. [*Id.* at 614-615.]

This statement implies that something less than probable cause might justify the search of a car, but nothing less will justify an arrest. *Stein* produced three vigorous dissents, two of which still required some level of cause before an arrest or search could be made.[19] Only Justice WEADOCK,

---

[19] Justice SHARPE argued:

Zealous officers should be encouraged in their efforts to rid their communities of violators of the law, and, while they may not make an arrest or search on suspicion alone, they may draw all reasonable inferences from acts done in their presence, and, if an act be so done, and the inference fairly deducible therefrom be such as to cause a prudent and careful officer to believe that the law is being violated, he may make an arrest and a search without the issue of a warrant to do so. [*Id.* at 621.]

After observing that "[w]hat is unreasonable or reasonable is a judicial question," Justice BUTZEL similarly argued:

after citing *Case, supra,* for the proposition that whether a search is reasonable is a judicial question, implied that general suspicion was enough to justify expansive police activity:

> It is the common knowledge of wardens, penologists, psychiatrists and other students of crime that every sizable community has persons who have no visible means of support but live well, who have criminal records and consort with known criminals. Yet society must wait until a crime is committed. They sit back quietly and plan. We know they are doing it. But we must not anticipate their move. When circumstances are to their liking we gaze into a gun held by a man we knew was a criminal, but whom the law would not permit us to hunt. Any city can be cleared of known criminals in 48 hours, if the hands of the police are unshackled and if the powers that be will assure them of backing and support. [*Id.* at 624-625.]

In *People ex rel Attorney General v Lansing Municipal Judge,* 327 Mich 410; 42 NW2d 120 (1950), the Michigan case most analogous to the present one, the Court struck down

> the provisions of PA 1948 (1st Ex Sess), No 43 (CL 1948, § 300.21 *et seq.* [Stat Ann 1949 Cum Supp § 13.1231(1) *et seq.*]) *subjecting to search without a warrant* the boat, conveyance, vehicle, automobile, hunting or fishing camp, fish box, fish house, net house, fish basket, game bag, game coat, or *any other receptacle, car* or conveyance in which wild

---

I believe that, by the same judicial process, we should restrict the rule, and that the search of an automobile under circumstances similar to those in the instant case, circumstances calculated to arouse the suspicions of a trained officer, should not be regarded as unreasonable. Such a restriction, however, does not entitle police officers to act maliciously, capriciously or without cause. [*Id.* at 623.]

life may be kept, carried or transported, of any person exercising the privilege of hunting, fishing or trapping, et cetera,. *and empowering conservation officers to require a person to permit such officers to inspect and examine, without warrant,* all wild life and any hunting, fishing or trapping apparatus, guns or ammunition in such person's possession or under his control merely *upon the officer's reasonable belief that the person in question has been, is, or is about to be* engaged in hunting, fishing or trapping of wild life or is in possession of such wild life or apparatus, but without probable cause to believe that such person has been or is violating the law . . . . [*Id.* at 425. Emphasis added.][20]

Referencing *Carroll v United States,* the majority observed that persons entitled to use the highways have a right to free passage without intervention or search except upon probable cause for believing the law to be violated.[21] After observing that *Kamhout, Roache,* and *Stein* all forbade the search of an automobile without a warrant absent probable cause, the Court concluded that the provisions of the disputed act "are in undoubted contraven-

[20] It is interesting to note that this same public act struck down by this Court as violative of Const 1908, art 2, § 10, itself forbade checkpoints for enforcing the law:

"*Provided further,* That nothing contained in this act shall be deemed to permit or allow the setting up or operation on designated State of Michigan trunk line highways of any road blockade, which, for the purpose of this act, shall be deemed to be the promiscuous or arbitrary halting of vehicular traffic for inspection or examination." [*Id.* at 413-414. (North, J., dissenting.) Emphasis in the original.]

[21] In *Carroll v United States,* 267 US 132, 149; 45 S Ct 280; 69 L Ed 543 (1925), the Court held that the right to free passage on the public highways precluded a suspicionless seizure of contraband, while authorizing warrantless seizures based upon "probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction . . . ." See *id.* at 154.

tion of the Michigan Constitution, art 2, § 10," *id.*
at 426, and thus unreasonable.

The state had argued in support of the statutory
right of a conservation officer "to inspect and
examine" an individual's game coat, shot guns,
and automobile, *id.* at 414, "that a person may
waive his constitutional rights against unreason-
able search . . . ." *Id.* at 426. This Court strongly
responded to the state's argument and the cases
presented to support it:

> Mention is made of *Surtman v Secretary of
> State,* 309 Mich 270 [15 NW2d 471 (1944)]; *Larr v
> Secretary of State,* 317 Mich 121 [26 NW2d 872
> (1947)]; *People v Thompson,* 259 Mich 109 [242 NW
> 857 (1932)], in which it was held that in accepting
> a license from the State to operate a motor vehicle
> upon public highways one must also accept all
> reasonable conditions imposed by the State
> thereon, such as the requirement that he stop and
> give assistance in cases of accidents, or that he
> comply with the financial responsibility act. But
> these cases do not hold, and it has not yet been
> held in Michigan that use of the highways involves
> waiver of one's constitutional rights against unrea-
> sonable search. That such waiver is not involved
> appears from such cases as *People v Kamhout,*
> *supra.* Can it be plaintiff's position that this is
> true solely because the legislature has not yet seen
> fit to require waiver of such constitutional immu-
> nity as a condition precedent to the use of the
> highways? To ask the question is to glimpse the
> lengths to which we shall one day be led, if, in the
> instant case, the "inspect and examine" require-
> ments of the statute are upheld on a waiver the-
> ory. [*Id.* at 426-427.]

After distinguishing what would today com-
monly be called regulatory and administrative

searches of commercial activities and enterprises,[22] such as public rooming houses, food-related establishments, and the liquor industry, the Court forcefully rejected the state's waiver arguments:

> Were we to hold that in every instance in which a license may lawfully be required its granting may at the same time be conditioned upon waiver of constitutional rights against unreasonable search, what area could conceivably remain immune and beyond legislative reach, upon which the constitutional guaranty might still operate? It will be said that no legislature would go so far as to dry up the entire stream of constitutional immunity. But it is not the genius of our system that the constitutional rights of persons shall depend for their efficacy upon legislative benevolence. Rather, the courts are charged with the solemn obligation of erecting around those rights, in adjudicated cases, a barrier against legislative or executive invasion. It is the responsibility of the courts to breathe the breath of life into constitutional rights, mandates, guaranties and limitations in the very face of contravening legislation. [*Id.* at 432.]

### B

Following *Mapp*'s 1961 application of the federal

---

[22] This distinguishing factor was later addressed by this Court in *Tallman v Dep't of Natural Resources,* 421 Mich 585, 622-623; 365 NW2d 724 (1984), when we adopted the pervasively regulated industry exception to the warrant requirement.

> [*Lansing Municipal Judge*] might prove apposite to the cases presently before this Court, but for the crucial fact that the party accused of violating the state's conservation laws in that case took the state's wildlife for pleasure rather than for profit. Because we deal here with parties engaged in a pervasively regulated *commercial* endeavor, *Lansing Municipal Judge* is inapposite. We do not pass here on the question whether the DNR may make warrantless searches, absent probable cause and exigent circumstances, of the persons or property of *recreational* fishers for the purpose of enforcing regulations which limit their activities. [Emphasis in the original.]

exclusionary rule to the states, the nature and
direction of this Court's search and seizure dia-
logue was transformed. Where we had previously
used federal precedent for the same instructive
purposes of any other foreign precedent in inter-
preting our own constitution, federal constitu-
tional precedent began to absorb our own. Most
modern decisions of this Court and the Court of
Appeals relating to automobile stops have focused
on federal constitutional opinions, rather than an
independent analysis of Const 1963, art 1, § 11. For
instance, in *People v Whalen,* 390 Mich 672; 213
NW2d 116 (1973), this Court granted leave to
decide

> [w]hether due to the warrantless stop and search
> of the automobile in which defendant was a pas-
> senger, which stop was part of a comprehensive
> scheme to search all automobiles on the highway
> —a roadblock—defendant's Fourth Amendment
> right to be free from unreasonable search and
> seizure had been violated. [*Id.* at 674-675.]

While the Court subsequently decided the case on
plain view grounds alone, specifically leaving open
the roadblock issue,[23] its analysis was exclusively
based on the Fourth Amendment, not Const 1963,
art 1, § 11.

However, Michigan's own constitutional prece-
dent has occasionally done service as powerful
authority, even where the Court also cited federal
decisions or standards. In *People v Parisi,* 393
Mich 31, 32; 222 NW2d 757 (1974), a unanimous
Court concluded that the initial stop of an automo-

---

[23] See *id.* at 683:

> [N]or do we decide if a stop of all cars as part of a systematic
> roadblock would be reasonable absent similar foundation facts
> respecting the reasonableness of stopping an individual car.

bile was without a "reasonable basis." Citing Michigan constitutional decisions, *Roache, Kamhout, Stein,* and *Lansing Municipal Judge,* as well as federal constitutional decisions, *Whalen, supra, Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), and *Adams v Williams,* 407 US 143; 92 S Ct 1921; 32 L Ed 2d 612 (1972), the Court concluded that "[n]o 'suspicious activity' has been offered here nor any testimony providing a reasonable basis for stopping the automobile." *Parisi, supra* at 37.

v

As long ago as 1889, the justices of this Court stated:

> Personal liberty, which is guaranteed to every citizen under our Constitution and laws, consists of the right of locomotion,—to go where one pleases, and when, and to do that which may lead to one's business or pleasure, only so far restrained as the rights of others may make it necessary for the welfare of all other citizens. One may travel along the public highways or in public places; and while conducting themselves in a decent and orderly manner, disturbing no other, and interfering with the rights of no other citizens, there, they will be protected under the law, not only in their persons, but in their safe conduct. The Constitution and the laws are framed for the public good, and the protection of all citizens, from the highest to the lowest; and no one may be restrained of his liberty, unless he has transgressed some law. [*Pinkerton v Verberg,* 78 Mich 573, 584; 44 NW 579 (1889).]

Our commitment to the protection of liberty was further demonstrated when the Supreme Court of Michigan adopted an exclusionary rule in 1919,

forty-two years before it was mandated by federal law. *People v Marxhausen,* 204 Mich 559; 171 NW 557 (1919). Moreover, as the cases discussed in part IV demonstrate, this Court's "historical general power . . . to construe the constitutional provision relating to searches and seizures," *Nash, supra* at 214, has been extended to the seizure and search of vehicles.

The scope of the power to review the reasonableness of a search and seizure was modified by the anti-exclusionary rule, mooting the art 1, § 11 reasonableness analysis in certain cases.[24] However, the history of our jurisprudence conclusively demonstrates that, in the context of automobile seizures, we have extended more expansive protection to our citizens than that extended in *Sitz.* This Court has never recognized the right of the state, without any level of suspicion whatsoever, to detain members of the population at large for criminal investigatory purposes. Nor has Michigan completely acquiesced to the judgment of "politically accountable officials" when determining reasonableness in such a context. *Sitz,* 496 US 453.[25]

---

[24] Under Const 1963, art 1, § 11:

[O]nce it has been determined that the search and seizure has occurred, in the words of the amendment, "outside the curtilage of any dwelling house in this State" and once it has further been determined that the articles seized and offered in evidence in a criminal proceeding are among those enumerated in that amendment (both of which are so here) then the circumstances of the arrest and of any search or seizure, or the frequently prickly question of whether or not the search and seizure was "unreasonable," appear to become totally irrelevant in any phase of the criminal case. [*People v Winkle,* 358 Mich 551, 554; 100 NW2d 309 (1960).]

While *Winkle* was interpreting Const 1908, art 2, § 10, as amended in 1936 and 1952, and not Const 1963, art 1, § 11, the two provisions are almost identical. See *Nash, supra* at 213.

[25] The existence of statutory authorization for sobriety checkpoints is questionable. It certainly did not come from the Legislature's

In these circumstances, the Michigan Constitution offers more protection than the United States Supreme Court's interpretation of the Fourth Amendment.

In *Roache, supra* at 222, this Court showed a marked hostility toward the use of a license check as a pretext to investigate criminal activity. In *Lansing Municipal Judge,* supra at 432, we stressed:

---

Drunk Driving Task Force statute, 1984 PA 348, MCL 257.625j(8); MSA 9.2325(10)(8), which, as amended (prior to the task force's final report), recommended:

> The task force shall not institute any program that includes sobriety check lanes in this state.

Furthermore, MCL 257.715(2); MSA 9.2415(2), the statute relied upon by the trial court to grant authority to the state police, if read as broadly as it was written, would allow the police to engage in federally unconstitutional behavior.

MCL 257.715(2); MSA 9.2415(2) allows:

> The director of the department of state police shall cause inspection to be made of motor vehicles operating on the public highways to detect defective equipment or other violations of law governing the use of public highways by motor vehicles, operators, and chauffeurs. For that purpose the director may establish temporary vehicle check lanes at appropriate locations throughout the state for checking for inadequacies and violations. A county, city, village, or township police department also may operate a temporary check lane within its limits with the express authorization of the director of the department of state police and under the direct supervision of a designated representative of the director.

The first sentence, which arguably could be read alone, would allow random stops in violation of *Delaware v Prouse,* 440 US 648; 99 S Ct 1391; 59 L Ed 2d 660 (1979). Moreover, the statute does not limit the scope of the officer's authority when looking for "violations of law governing the use of public highways by  . . . operators." MCL 257.715(2); MSA 9.2415(2). The plain language of the statute would apparently authorize officers at one of these suspicionless roadblocks to demand that drivers submit to a Breathalyzer test or blood workup to determine if they are under the influence of a forbidden drug.

Because our ruling extends with equal force to the executive and legislative branches of state government, we leave for another day a more complete interpretation of MCL 257.715(2); MSA 9.2415(2).

It will be said that no legislature would go so far as to dry up the entire stream of constitutional immunity. But it is not the genius of our system that the constitutional rights of persons shall depend for their efficacy upon legislative benevolence. Rather, the courts are charged with the solemn obligation of erecting around those rights, in adjudicated cases, a barrier against legislative or executive invasion.

The Michigan Constitution has historically treated searches and seizures for criminal investigatory purposes differently than those for regulatory or administrative purposes. *Lansing Municipal Judge, supra* at 427-429. These administrative or regulatory searches and seizures have traditionally been regarded as "reasonable" in a constitutional sense. *Id.* at 430. However, seizures with the primary goal of enforcing the criminal law have generally[26] required some level of suspicion, even if that level has fluctuated over the years.

We do not suggest that in a different context we might not reach a similar result under the balancing test of reasonableness employed in *Sitz.* Indeed, our precedent regarding automobiles implicitly incorporates a balancing test that is inherent in assessing the reasonableness of warrantless searches and seizures. We hold only that the protection afforded to the seizures of vehicles for criminal investigatory purposes has both an historical foundation and a contemporary justification that is not outweighed by the necessity advanced.[27] Suspicionless criminal investigatory seizures, and extreme deference to the judgments of politically

[26] Today's decision casts no doubt on the ability of the police to conduct roadblocks for the purpose of apprehending individuals fleeing the scene of a crime.

[27] We note, as we did in *Nash* at 214, that "the people of the State of Michigan have corrected this Court when they have believed it to have gone too far . . . ."

accountable officials is, in this context, contrary to Michigan constitutional precedent.

The decision of the Court of Appeals is affirmed.

LEVIN, RILEY, and MALLETT, JJ., concurred with BOYLE, J.

CAVANAGH, C.J., concurred only in the result.

BRICKLEY, J. (*dissenting*). As the majority states, it is important to recognize what this case is not about. It is not, as the majority notes, about the unreasonable treatment of a particular person detained at a particular checkpoint. *Ante* at 749-750, quoting *Michigan Dep't of State Police v Sitz,* 496 US 444, 449-450; 110 S Ct 2481; 110 L Ed 2d 412 (1990). However, contrary to the tenor of the majority opinion, this case is also not about the standard governing the seizure of a particular driver for a particular reason. Rather, this case concerns the standard governing the systematic seizure of every vehicle passing through a given point at a given time vis-à-vis a sobriety checkpoint program. Because I believe the majority relies upon an inapposite line of authority to support its conclusion that "there is no support in the constitutional history of Michigan for the proposition that the police may engage in warrantless and suspicionless seizures of automobiles for the purpose of enforcing the criminal law," *ante* at 747, and because I believe that history compels a contrary conclusion, I respectfully dissent.

I

The majority finds that the *Nash*[1] "compelling reason" test is satisfied because the state's "juris-

---

[1] *People v Nash,* 418 Mich 196, 214; 341 NW2d 439 (1983).

prudential history" compels a departure from the
more narrow federal interpretation of search and
seizure constraints. Even if this were true, I be-
lieve that the majority relies on the wrong line of
cases in this Court's history to support the conclu-
sion it reaches.

While this case deals with the systematic "sei-
zure" of every vehicle passing a given point at a
given time, the majority's "jurisprudential his-
tory" reflects cases in which individuals and their
automobiles were seized and sometimes searched
for individual, particular reasons. For example,
the majority relies on *People v Kamhout,* 227
Mich 172; 198 NW 831 (1924), and, to a lesser
extent, *People v Krahn,* 230 Mich 528; 203 NW
105 (1925), for the proposition that "reasonable
grounds" are needed to seize and search an auto-
mobile. Such a standard, the majority concludes,
"remains unmodified by precedent." *Ante* at 766.
The majority relies upon another opinion, *People v
Case,* 220 Mich 379, 389; 190 NW 289 (1922), for
the notion that what is "reasonable" depends upon
the totality of the circumstances of the search and
seizure.

What is not noted, however, is that these cases
are clearly distinguishable from the case at bar. In
*Case,* the police officer searched an immobile truck
while the owner was not present. 220 Mich 380-
381. The vehicle was parked at public fairgrounds
and was searched as part of police efforts to main-
tain order and protect fairgoers. *Id.* at 389. Like-
wise, in *Kamhout,* the police searched a stationary
automobile parked in front of the vehicle owner's
home while the owner was seated in the front seat.
227 Mich 173-174. Without any particularized sus-
picion, the police officer approached the vehicle,
built up to resemble a bread wagon, reached in

through a broken window, grabbed a carton, and
found two jugs containing moonshine whiskey. *Id.*
at 174. And, in *Krahn,* the police stopped a horse-
drawn wagon because the city marshal had noti-
fied the police that he had seen the tops of whis-
key containers protruding through bales of hay
the wagon carried. 230 Mich 529.

The majority also relies upon *People v Roache,*
237 Mich 215; 211 NW 742 (1927), and *People v
Stein,* 265 Mich 610; 251 NW 788 (1933), for the
proposition that at least reasonable grounds are
needed to stop every automobile that is a part of a
criminal investigation. In *Roache,* a police officer
stopped an automobile because "the occupants of
the car looked back at him after they had passed,
and . . . the driver was going slower than the
majority of cars driven along this highway." 237
Mich 222. Similarly, police officers in *Stein* pulled
over a vehicle in which the defendants were riding
because

> [one of the police officer's] attention was attracted
> to a taxicab in which defendants were passengers
> because it was "traveling pretty fast," about 32
> miles per hour. He pursued it about a block and,
> when he was "right abreast of the back rear door"
> of the cab he "noticed the defendant Stein reach-
> ing into his pocket as if to take something out and
> place his hand behind him . . . as if he was tak-
> ing something out of his pocket and putting it on
> the seat beside him" or behind him. Stein's motion
> gave [the police officer] "the idea that he was
> putting a gun away." [265 Mich 612.]

In sum, the cases the majority relies upon deal
with individualized vehicle stops, or at least ap-
proaches to individual stationary vehicles, to sat-
isfy suspicions about particular vehicles. Not one
case deals with the systematic seizure of all vehi-

cles passing through a given point at a given time.[2]
I believe, therefore, that the majority relied upon
the wrong line of cases to support its conclusion
that the "jurisprudential history" of the state
compels a finding that some level of reasonable
grounds are needed to seize vehicles pursuant to a
sobriety checkpoint program.

II

The question whether art 1, § 11 of the Michigan
Constitution allows the systematic seizure of all
vehicles passing through a given point at a given
time for purposes of a sobriety checkpoint is one of
first impression for this Court. Indeed, this Court
has never considered the constitutionality of the
systematic seizure of a large group of vehicles or

[2] According to the majority, *People ex rel Attorney General v
Lansing Municipal Judge,* 327 Mich 410; 42 NW2d 120 (1950), is most
analogous to the case at bench. There, this Court struck down a
public act that, inter alia, allowed a conservation officer to stop and
search automobiles without a warrant where the officer had reason to
believe that the automobile's occupants were engaged in or about to
engage in illegal hunting practices. 327 Mich 435. This Court held
that such a search could be sustained only when supported by
probable cause. *Id.* at 425-426.

Other than its characterization of *Lansing Municipal Judge* as
being "most analogous" to the case at bench, I agree with the
majority's analysis of that case. I submit, however, that the facts in
*Lansing Municipal Judge* are more closely analogous to roving check-
point cases than to the more permanent type at issue in the case at
bench. The seizures at issue in *Lansing Municipal Judge* are not the
result of a systematic seizure of every hunter in a given area at a
given time. On the contrary, individual conservation officers were
given enormous discretion to seize any person they wished. *Id.* at 425.
Similarly, the problem with roving checkpoints is the unfettered
discretion officers have in stopping individual motorists. See, gener-
ally, *United States v Ortiz,* 422 US 891; 95 S Ct 2585; 45 L Ed 2d 623
(1975). Just as probable cause is needed to seize a motorist pursuant
to a roving checkpoint, *id.* at 896-897, I believe that probable cause is
the proper standard for the type of seizure at issue in *Lansing
Municipal Judge.* However, because I believe that the factors that
distinguish more permanent checkpoints from roving checkpoints also
distinguish the *Lansing Municipal Judge* seizures, I am not convinced
that *Lansing Municipal Judge* compels a requirement of probable
cause in the case at bench.

individuals for any reason. Notwithstanding its *Sitz* opinions, however, the Court of Appeals has implicitly acknowledged the constitutionality of such systematic seizures.

In *People v Holland,* 155 Mich App 419, 420-422; 399 NW2d 547 (1986), the Court of Appeals upheld the defendant's conviction for possession of cocaine. The cocaine used to convict the defendant fell from his pocket after United States Customs officials boarded the defendant's boat, without a warrant or probable cause, and inspected certain documents.[3] The Court held that neither the state nor federal constitution prohibited such conduct because the water in which the defendant's boat was moored at a designated port of entry serving as `a boundary between the United States and Canada.

> Consequently, due to the easy access the river provides to Canada, document checks of boaters thereon serve the same public interests as those present in [*United States v Villamonte-Marquez,* 462 US 579; 103 S Ct 2573; 77 L Ed 2d 22 (1983)]. As elaborated upon by that Court, documentation laws assist in the regulation of imports and exports and the enforcement of environmental laws and United States shipping laws. [Citation omitted.] Further, enforcement of the documentation laws requires only a brief detention, during which searches are limited to a visual inspection of only those areas within the official's plain view. [*Id.* at 422.]

For present purposes, the *Holland* Court's most

---

[3] Section 1581(a) of the Tariff Act provides in pertinent part:

> Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States . . . and examine the manifest and other documents and papers . . . . [19 USC 1581(a).]

important statement followed this explanation as it justified the use of what amounted to a roving patrol of customs officials checking vessel documents. The Court noted that such an asystematic procedure was necessary to achieve the state's interests because, "[d]ue to the nature of the waterborne commerce, permanent checkpoints, such as the type utilized on main roads leading away from borders, cannot be maintained." *Id.* Citing federal precedent,[4] the Court implicitly stated that, had a permanent checkpoint been a feasible alternative, it would have sustained its use to allow a more systematic inspection of vessel documents.

The Court of Appeals reacknowledged the constitutionality of permanent checkpoints in *NAACP v Dearborn,* 173 Mich App 602; 434 NW2d 444 (1988), lv den 433 Mich 906 (1989) (Brickley, Riley and Griffin, JJ., dissenting). At issue in that case was a city ordinance restricting the use of Dearborn's neighborhood parks to city residents and their guests only. *Id.* at 606-607. Aside from the race discrimination implications, the Court held that the ordinance violated state and federal constitutional prohibitions against unreasonable searches and seizures because it allowed any police officer to require a park user to stop and produce identification proving Dearborn residency. *Id.* at 620. The Court noted that

[a]bsolutely no neutral criteria are set forth in the

---

[4] In acknowledging the constitutionality of permanent checkpoints, the *Holland* Court noted that

[i]n *United States v Martinez-Fuerte,* 428 US 543; 96 S Ct 3074; 49 L Ed 2d 1116 (1976), the Supreme Court upheld the authority of federal border patrols to maintain permanent checkpoints at major roadways leading away from international borders, at which vehicles may be stopped for brief questioning even though officials have no reason to believe that such vehicles contain illegal aliens. [155 Mich App 422, n 1.]

ordinance to ensure that the governmental intrusion is not the product of the detaining personnel's unfettered discretion; absolutely no objective standards are provided in the ordinance to warrant that the governmental intrusion is not the product of the detaining personnel's unlimited and unguided "wish." [*Id.*]

Again, for present purposes, the Court of Appeals most important statement is its recognition that a systematic procedure for checking the identity of all park users would withstand constitutional scrutiny. In acknowledging the NAACP's concession in this regard, the Court noted that "fencing the city's parks and requiring all users to display identification of residency at the point of entry would constitute a constitutionally acceptable method of enforcing the ordinance's nonresident provisions." *Id.* at 620, n 4.

Although this Court has never done so, on at least two occasions the Court of Appeals has implicitly acknowledged the constitutionality of the systematic seizure of individuals passing through a given place at a given time. While such authority is not binding upon this Court, I find it to be highly persuasive.

III

As noted above, this case deals only with the limited question whether a sobriety checkpoint program violates art 1, § 11 of the Michigan Constitution. In the absence of Michigan case law directly on point, I believe that federal case law is instructive on the limited question this case presents.

When the United States Supreme Court considered the constitutionality of Michigan's sobriety

checkpoint program, it specifically rejected the
argument that the proper analysis required an
assessment of whether the seizures were supported
by reasonable suspicion or probable cause. *Sitz,*
496 US 449-450. Instead, because of the nature of
the seizure, to wit, the systematic stopping of all
vehicles passing through a given point at a given
time, and the fact that such a seizure was less
intrusive than a traditional arrest, the Supreme
Court adopted the balancing analysis espoused in
*Brown v Texas,* 443 US 47; 99 S Ct 2637; 61 L Ed
2d 357 (1979). *Sitz,* 496 US 450.

In *Brown,* the Supreme Court ruled that the
reasonableness of a seizure less intrusive than an
arrest depended upon "a balance between the
public interest and the individual's right to per-
sonal security free from arbitrary interference by
law officers." 443 US 50, quoting *Pennsylvania v
Mimms,* 434 US 106, 109; 98 S Ct 330; 54 L Ed 2d
331 (1977). In other words, when reviewing the
constitutionality of a seizure, courts must weigh
"the gravity of the public concerns served by the
seizure, the degree to which the seizure advances
the public interest, and the severity of the inter-
ference with individual liberty." 443 US 51. More-
over, the Court noted that reviewing courts should
take steps "to assure that an individual's reason-
able expectation of privacy is not subject to arbi-
trary invasions solely at the unfettered discretion
of officers in the field." *Id.* To that end,

> the Fourth Amendment requires that a seizure
> must be based on specific, objective facts indicating
> that society's legitimate interests require the sei-
> zure of the particular individual, or that the sei-
> zure must be carried out pursuant to a plan em-
> bodying explicit, neutral limitations on the con-
> duct of individual officers. [*Id.*]

I believe that the balancing analysis in *Brown* is

consistent with the requirements of the Michigan Constitution. In applying this analysis to the facts of this case, I believe that Michigan's sobriety checkpoint program withstands constitutional scrutiny.

A

No one can seriously dispute the gravity of problems associated with drinking and driving. In 1991, the most recent year in which statistics have been compiled, drugs or alcohol played a role in forty-five percent of all fatal accidents occurring on Michigan roads. Michigan Department of State Police, *Michigan Traffic Crash Facts 1991* (Lansing, Michigan: Office of Highway Safety Planning), p 22. Statistics show that a blood-alcohol level as small as 0.04 percent significantly increases the likelihood of a traffic accident. *Id.* at 20. At a level of 0.06, the probability of a crash is twice as likely than when no alcohol is involved; when the level reaches 0.10, the probability is six times higher; and, when it reaches 0.15, the probability of a crash is twenty-five times greater than if the driver is sober.[5] *Id.* While the number of traffic deaths related to alcohol or drugs decreased almost six percent from 1990,[6] it can hardly be disputed that the problem continues to be grave.

B

The next factor in the balancing analysis re-

---

[5] On average, a traffic accident was reported in Michigan once every 1 minute and 26 seconds and caused over $3 billion in economic losses in 1991. See *Crash Facts,* p 5.

[6] *Crash Facts,* p 7. Indeed, 1991 saw a decrease in every category in which statistics were compiled (i.e., total number of crashes, number of fatal crashes, number of persons killed, number of persons injured, etc.).

quires inquiry into the "degree to which the seizure advances the public interest." 443 US 51. The United States Supreme Court in *Sitz* was quick to point out that this factor was not meant to transfer from state officials to the courts the decision regarding which technique should be used to combat the drinking and driving problem. 496 US 453. The Court also noted:

> Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers. [*Id.* at 453-454.]

In other words, as long as the means chosen to promote the public's interest is "reasonable," the success rate of that means measured by empirical evidence need not be outstanding.

Empirical data from the one checkpoint conducted in Michigan supports the view that checkpoints reasonably advance the public interest in eradicating drunk driving. During the use of that checkpoint, 126 vehicles passed through during the span of just over one hour. *Ante* at 748. Of that number, two drivers were arrested for driving under the influence of alcohol. *Id.* This means that 1.6 percent of all drivers stopped or "seized" were arrested for drunk driving. In reviewing a checkpoint designed to detect the presence of illegal aliens, the United States Supreme Court upheld a success rate of only 0.12 percent.[7] On the basis of a

---

[7] See *United States v Martinez-Fuerte,* n 4 *supra* at 554 (the Court upheld illegal alien checkpoints, notwithstanding the fact that in one of the consolidated cases considered on appeal, illegal aliens were

comparison of these two cases, I am satisfied that Michigan's sobriety checkpoint program reasonably advances the public's interest in discouraging drunk driving.[8]

C

The final factor requires analysis of "the severity of the interference with individual liberty." 443 US 51. During the checkpoint conducted, the average delay to motorists was twenty-five seconds or less. Again, comparing this case to the United States Supreme Court's review of illegal alien checkpoints, intrusion on motorists is slight.[9] In reviewing such checkpoints, the Supreme Court noted:

> Routine checkpoint stops do not intrude . . . on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both ap-

found in only 0.12 percent of the vehicles passing through the checkpoint).

[8] The fact that sobriety checkpoints act as a short-term deterrent against drunk driving makes them an even more reasonable means of combating the drunk driving problem. This fact, as testified to below by an expert witness, offers some explanation for the low number of intoxicated drivers seized at the checkpoint. Aware of the increased risk of detection, drinking motorists have a new incentive to avoid Michigan roadways.

[9] During the initial inspection of cars, a border patrol officer would stand between the line of cars brought virtually to a halt and visually inspect the occupants of the vehicle. *Martinez-Fuerte,* 428 US 546. Most motorists were allowed to continue on their way without any oral examination or close visual inspection. *Id.* A small number of cars, however, were directed to a secondary area where the occupants were questioned for as long as five minutes concerning their citizenship and immigration status. *Id.* at 546-547. Notwithstanding this lengthy detention, the Supreme Court found that the intrusion visited upon those subject to either area of the checkpoint was minimal. *Id.* at 557-558.

pear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review. [*United States v Martinez-Fuerte*, 428 US 543, 559; 96 S Ct 3074; 49 L Ed 2d 1116 (1976).]

Moreover, in distinguishing checkpoints from roving-patrol stops, the United States Supreme Court has stated:

[T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion. [*United States v Ortiz*, 422 US 891, 894-895; 95 S Ct 2585; 45 L Ed 2d 623 (1975).]

It is clear that the more permanent types of checkpoints impose only minimal intrusions on the motoring public.

Likewise, Michigan's sobriety checkpoint program does not intrude upon the motoring public. According to the checkpoint guidelines, the existence of the program will be widely publicized; motorists should not, therefore, be taken by surprise when coming upon a checkpoint. Motorists will not be frightened by the checkpoints because they can see that every other vehicle is stopped and that all the officers present are in uniform. The location of the checkpoints will not be chosen by officers in the field, but is to be based on certain criteria approved by the Director of the Department of State Police, the person responsible for determining the most effective allocation of limited enforcement resources. Necessarily, then, field officers have no discretion in picking and choosing whom to investigate; rather, they may stop only those cars passing through the checkpoint.[10] In other words, seizures resulting from the checkpoints are carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers. Moreover, the guidelines also address concerns such as safety considerations, equipment, motorist contact, and briefing and debriefing checkpoint officers. On the basis of this information, I agree with the United States Supreme Court that the intrusion on motorists caused by sobriety checkpoints is minimal. On balance, I am convinced that the state's interest in eradicating the drunk driving problem and the reasonable manner in which sobriety checkpoints further that goal outweighs the minimal intrusion the checkpoints visit upon Michigan motorists who are only momentarily stopped.

---

[10] Of course, it is these factors that eliminate the unfettered discretion of individual police officers that distinguish the case at bench from cases such as *Lansing Municipal Judge,* n 2 *supra,* and *NAACP, supra.*

IV

I conclude that not only is there no compelling reason to embark on a more restrictive interpretation of search and seizure under our art 1, § 11, but there are strong reasons not to do so.

.Contrary to the thrust of "new federalism" as described by the majority, there are distinct advantages to uniformity in the interpretation of search and seizure constitutional provisions. The interstate flow of traffic on our intrastate and interstate highway system argues for uniformity in highway safety enforcement. This uniformity is not enhanced by our Court's departure today from the *Nash* approach to search and seizure interpretation under the Michigan Constitution.

Furthermore, despite the criticism of the *Brown* analysis for its disavowal of an articulable suspicion standard as an indispensable minimum requirement in limited seizures under the circumstances of this case, it does, in my judgment, recognize the reality of the times in which we live.

Technological advances in miniaturization and the concomitant development of easily concealed destructive devices (not to mention the lethal force of an automobile driven by an intoxicated person), coupled with increasing levels of violence and the threat of international terrorism, are going to continue to prompt the need for and the public acceptance of surveillance-inspection techniques that involve minimum inconveniences and intrusions as a necessary trade-off for the personal safety and security of the population at large. Such systematic and evenly enforced measures need not erode the traditional and accepted standards of probable cause and articulable suspicion when employed in the customary criminal investigation context.

Accordingly, this is not, in my view, the time, nor does this case present the circumstances, to have the Michigan Constitution digress from the evolving Fourth Amendment standards as interpreted by the United States Supreme Court.

For the above-stated reasons, I believe that the Michigan Constitution is satisfied by the balancing analysis set forth in *Brown* and applied to this case by the United States Supreme Court, and not a determination of articulable suspicion or probable cause. I would hold that Michigan's sobriety checkpoint program withstands Michigan constitutional scrutiny. I would, therefore, reverse the decision of the Court of Appeals.

GRIFFIN, J., concurred with BRICKLEY, J.